UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAKEISHA THOMAS,

                             CASE NO. 2:19-cv-10268

           *Plaintiff*,          DISTRICT JUDGE MARK A. GOLDSMITH
*v*.                           MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL
SECURITY,

          *Defendant*.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 15, 19)

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports Defendant Commissioner of Social Security's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (ECF No. 15), be **DENIED**, the Commissioner's Motion, (ECF No. 19), be **GRANTED**, and the Commissioner's final decision denying benefits be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Referral, (ECF No. 3), this case was referred to me to review the Commissioner's final decision denying Plaintiff's claim for Supplemental Security Income ("SSI") under Title XVI, 42 U.S.C. § 1381 et seq. (ECF No. 6 at PageID.29-40). The case is presently before

1

the Court upon the parties' cross-motions for summary judgment. (ECF Nos. 15, 19).

Plaintiff filed her application for SSI in September 2013, alleging a disability onset date of September 18, 2013. (ECF No. 6 at PageID.185). After her claim was initially denied, she appeared and testified before Administrative Law Judge (ALJ) Henry Perez, Jr. on June 29, 2015. (*Id*. at PageID.56). She received a partially favorable hearing decision on October 27, 2015, granting SSI benefits as of August 21, 2015. (*Id*. at PageID.52-66). Plaintiff requested a review of the ALJ decision regarding the onset date from the Appeals Council. (*Id*. at PageID.116-17). On February 14, 2017, the Appeals Council vacated the October 27, 2015 decision and remanded for resolution of: (1) inconsistencies in the ALJ's decision regarding the finding of an intellectual disorder under listing 12.05C of 20 CFR Part 404, Subpart P, Appendix 1; (2) further consideration of Plaintiff's residual functional capacity (RFC) regarding her ability to engage in work-related mental activities; and (3) and evaluation of the opinion evidence of record. (*Id.* at PageID.69-70). On remand, the ALJ was instructed to further evaluate Plaintiff's mental impairments, consider Plaintiff's maximum RFC during the entire period at issue, and provide rationale with specific references to the evidence of record. (*Id*. at PageID.70).

On April 3, 2017, Plaintiff through counsel requested to withdraw her request for review of ALJ Perez's decision, but was informed that the matter could not be withdrawn. (*Id*. at PageID.123-24).

On September 12, 2017, Plaintiff and a vocational expert (VE) appeared and testified before ALJ Carol Guyton. (*Id.* at PageID.314-357). On November 1, 2017, ALJ Guyton issued a decision finding that Plaintiff was not disabled at any time between her

amended alleged disability onset date of September 18, 2013, through the decision date.
(*Id*. at PageID.29-40). Plaintiff appealed, but the Appeals Council declined to review ALJ
Guyton's November 2017 decision. (*Id*. at PageID.20-21). On January 28, 2019, Plaintiff
filed this civil action seeking judicial review of the Commissioner's final decision denying
her SSI claim. (ECF No. 1). The case is now ready for resolution.

### B.     Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative
decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to
determining whether the "Commissioner has failed to apply the correct legal standard or
has made findings of fact unsupported by substantial evidence in the record." *Sullivan v.
Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks
omitted). Substantial evidence is "more than a scintilla of evidence but less than a
preponderance; it is such relevant evidence as a reasonable mind might accept as adequate
to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)
(internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider
any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker
v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not
"try the case de novo, nor resolve conflicts in the evidence, nor decide questions of
credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).
If the Commissioner's decision is supported by substantial evidence, "it must be affirmed
even if the reviewing court would decide the matter differently and even if substantial

evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work.

> If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)). The RFC "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

### D.   ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 6, PageID.39). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 18, 2013, the application date. (*Id.* at PageID.31). At step two, the ALJ concluded that Plaintiff had the following severe impairments: "lumbago, diabetes, obesity, intellectual disability, mood disorder,

depression, and anxiety." (*Id.*). At step three, the ALJ determined that Plaintiff did not have

an impairment or combination of impairments that "met or medically equaled the severity"

of a listed impairment. (*Id.* at PageID.32). Before proceeding to the final steps, the ALJ

found that Plaintiff had the residual functional capacity (RFC) to perform

> light work as defined in 20 CFR 416.967(b) except: the claimant could
> occasionally climb ramps and stairs, balance, stoop, and couch. She could
> never crawl, kneel, or climb ladders, ropes, or scaffolds. She should avoid all
> exposure to hazardous machinery and unprotected heights. She should have
> no more than moderate exposure to fumes, dust, odors, gases, or poor
> ventilation. She would be limited to simple routine tasks involving no more
> than simple short instructions and simple work-related decisions with few
> work place changes and no contact with the general public and occasional
> contact with coworkers.

(*Id.* at PageID.35). At step four, the ALJ found Plaintiff had no past relevant work. (*Id.* at

PageID.38). At step five, the ALJ concluded that, considering Plaintiff's age, education,

work experience, and RFC, "there were jobs that existed in significant numbers in the

national economy that claimant can perform." (*Id.*).

## E. Administrative Record

### 1. Medical Evidence

The earliest medical records are from September 2004, when Plaintiff presented

with GERD and allergies and potentially had the flu. (ECF No. 6 at PageID.271). In

November 2005, Plaintiff complained of a cough, sore throat, and headache; the physician

noted her systems were unremarkable. (*Id.* at PageID.270). In January 2006, she saw a

physician about her asthma; all her systems were again unremarkable. (*Id.* at PageID.269).

In June 2006, she presented with a cough and cold; her weight was 294, she had

hypertension, her blood pressure was 142/78, and her other systems appeared

6

unremarkable. (*Id*. at PageID.268).

In April 2007, she presented with hypertension, her pulse was 96, her weight was 324, her blood pressure was 170/89, and her doctor noted obesity. (*Id*. at PageID.267). In August, she returned and had lost about ten pounds. (*Id*. at PageID.265). She returned the following month for refills; her weight had increased to 320, she continued to have hypertension, and her blood pressure was 157/89. (*Id*. at PageID.264). In January 2008, her physician noted that her hypertension was "not controlled" at 157/100, that she was obese at 316 pounds, and that her other systems were otherwise unremarkable. (*Id*. at PageID.263). In March of 2008, her hypertension persisted. (*Id*. at PageID.262). In October 2008, Dr. Chwikani noted her hypertension persisted with her blood pressure at 139/81 and she weighed 318 pounds. (*Id*. at PageID.261).

In March 2009, Plaintiff weighed 294 pounds and continued to have hypertension with blood pressure at 163/86; all her other systems were unremarkable. (*Id*. at PageID.260). In June 2009, Plaintiff presented with complaints of headaches; she continued to suffer from hypertension and obesity with a blood pressure of 156/96 and a weight of 316 pounds. (*Id*. at PageID.259). In September 2009, Plaintiff presented with a headache and requested refills; her blood pressure was 129/72 and she weighed 325 pounds; her other systems were otherwise unremarkable. (*Id*. at PageID.258). In November 2009, Plaintiff presented with a headache, fatigue, joint pain, and hypertension; her resting pulse was 100, her blood pressure was 169/104 and her other systems were otherwise unremarkable. (*Id*. at PageID.257).

In February 2010, she complained of pain; it was noted she had recently had

7

gestational diabetes during a pregnancy, that she continued to struggle with hypertension, and that her blood pressure was 139/78. (*Id*. at PageID.256). She came in for refills and complaining of a cough in May 2010; it was noted that her blood pressure was 146/91 and her pulse was 83. (*Id*. at PageID.255). In August 2010, she appeared to present with early symptoms of pregnancy and morning sickness; her blood pressure was 124/65 and she continued to have hypertension. (*Id*. at PageID.254). The following month, she presented as three months pregnant, had Type II Diabetes, and her blood pressure was 103/55. (*Id*. at PageID.253).

The record then jumps to 2013. In January 2013, Plaintiff's systems were all normal except that her blood pressure was 143/88 and that she had hypertension. (*Id*. at PageID.252). In April 2013, Dr. Chwikani noted that Plaintiff had "serious obesity, diabetes, and hypertension;" her blood pressure was 163/60. (*Id*. at PageID.251). In a May 2013 CT head and brain examination, it was noted the Plaintiff had no acute intracranial abnormality, no mass effect or midline shift, unremarkable and symmetrical orbits, and some irregularity to her medial left wall which "may reflect old injury." (*Id*. at PageID.225). Her physical assessment indicated that she was alert, oriented, had appropriate affect, and had no respiratory distress. (*Id*. at PageID.228).

In January 2014, Plaintiff complained of back pain and had continued hypertension; her systems were otherwise unremarkable. (*Id*. at PageID.250). Also in January 2014, Plaintiff was examined by Dr. Elizabeth Edmond, who noted Plaintiff was morbidly obese with a BMI of 48, had hypertension, had chronic lumbar pain, had diabetes mellitus, walked slowly, and had a limited education. (*Id*. at PageID.234-38). The test findings from

8

this date indicated that Plaintiff's lumbar spine flexion was 0 to 40 degrees where the "normal" was 90 degrees; her lumbar spine extension, right lateral flexion, and left lateral flexion were 0 to 10 degrees where the normal was 25 degrees. (*Id.* at PageID.235). The test findings also indicated that Plaintiff's right and left hip abductions were 20 degrees where the normal was 40 degrees; he left and right hip adductions were 0 to 20 degrees where the normal was 0 to 20 degrees; her left and right hip forward flexions were 90 degrees where the normal was 100 degrees; her right and left hip extensions were 20 degrees where the normal was 30 degrees; her right and left hip internal rotations were 20 degrees where the normal was 40 degrees; and her right and left hip external rotations were each 20 degrees where the normal was 50 degrees. (*Id.*). Dr. Edmond also noted that Plaintiff's right and left knee flexions were 0 to 100 degrees where the normal was 0 to 150 degrees and that her right and left knee extensions were 0 degrees where the normal for each was 0 degrees. (*Id.* at PageID.236). Dr. Edmond further noted that Plaintiff's "current abilities" included limited abilities in standing and climbing stairs and inability to bend, stoop, squat or rise from squatting, and to get on and off an examination table. (*Id.* at PageID.237). Dr. Edmond also maintained that Plaintiff's "current abilities" included sitting, carrying small weights, pushing and pulling while sitting, buttoning clothes, tying shoes, dialing a telephone, writing, picking up a pencil, picking up a coin, making a fist, opening a door, and dressing and undressing. (*Id.*). In March 2014, Plaintiff presented with hypertension with a blood pressure of 151/79, for which she took medication; her other systems were unremarkable. (*Id.* at PageID.249).

In June 2015, Plaintiff saw Elaine Tripi, Ph.D., for a psychological assessment. (*Id.*

at PageID.239-247). During this assessment, it was determined that Plaintiff had an IQ of 71, which placed her "in the borderline range of intelligence." (*Id.* at PageID.240). Her composite scores were as follows: verbal comprehension at 66 (described as extremely low and 1st percentile); perceptual reasoning at 67 (described as extremely low and 1st percentile); working memory at 8 (described as low average and 9th percentile); processing speed at 94 (average and 34th percentile); full scale at 71 (borderline and 3rd percentile). (*Id.*). She scored in the second percentile on word reading and first percentile on both spelling and math computation. (*Id.*). Dr. Tripi noted that Plaintiff could read and recognize words outside the context of sentences and paragraphs at a third grade level and that her spelling and math abilities were at a second grade level; she further noted it was "doubtful that with further educational exposure she would be able to improve in all areas of basic educational functioning. She is functionally illiterate." (*Id.*). Dr. Tripi further noted that Plaintiff appeared depressed, had not had any type of mental health treatment, and that her diabetes was "out of control." (*Id.* at PageID.241).

Regarding her understanding and memory, Dr. Tripi noted that Plaintiff's limitation in her ability to remember locations and work-like procedures was "moderate," that her limitation in her ability to understand and remember very short and simple instructions was likewise "moderate," and that Plaintiff's limitation in her ability to understand and remember detailed information was "marked." (*Id.* at PageID.244). Regarding her sustained concentration and persistence, Dr. Tripi noted Plaintiff's limitation in her ability to carry out very short and simple instructions as "moderate," her limitation in her ability to carry out detailed instructions as "marked," her limitation in her ability to maintain

attention and concentration for extended periods as "marked," her limitation in her ability to perform activities within a schedule, maintain regular attendance, and be punctual as extremely limited. (*Id*.). Further, Dr. Tripi noted that Plaintiff's ability to sustain an ordinary routine without special supervision was markedly limited, her ability to work in coordination or proximity to others without being distracted by them was markedly limited, and that she was extremely limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id*. at PageID.245). Regarding Plaintiff's social interaction, Dr. Tripi noted that her ability to interact appropriately with the general public was markedly limited, her ability to ask simple questions and request assistance was moderately limited, her ability to accept instructions and respond appropriately to criticism from supervisors was markedly limited. (*Id*.). Additionally, Dr. Tripi noted that Plaintiff's ability to get along with coworkers without distracting them or exhibiting behavioral extremes was markedly limited and that Plaintiff's ability to maintain socially appropriate behavior and adhere to basic standards of neatness was moderately limited. (*Id*.). Regarding Plaintiff's adaptation abilities, Dr. Tripi noted that Plaintiff's ability to respond appropriately to changes in the work setting was moderately limited, that her ability to be aware of normal hazards and take appropriate precautions was moderately limited, and that her ability to travel to unfamiliar places or use public transportation was markedly limited. (*Id*. at PageID.246). Finally, Dr. Tripi noted that Plaintiff was markedly limited in her ability to set realistic goals or make plans independently of others and extremely limited in her ability to tolerate normal levels of

11

stress. (*Id.*).

In August 2015, Plaintiff saw Dr. Boneff for a consultative psychological examination. (*Id.* at PageID.294-300). During this examination, Dr. Boneff noted that Plaintiff was "angry and sad," that she answered questions in a "logical, goal directed fashion," that she knew the date and how to spell her names correctly, and diagnosed her as "mildly retarded" with "borderline intellectual functioning," noting that the "prognosis is fair to good." (*Id.* at PageID.295-97). Dr. Boneff noted that Plaintiff's abilities to understand and remember simple instructions, carry out simple instructions, and make judgments on simple work-related decisions were mildly impaired and that her abilities to understand, remember, and carry out complex instructions and to make judgments on complex work-related decisions were markedly impaired. (*Id.* at PageID.298).

In August 2017, Plaintiff had a psychological evaluation with Dr. Sollars, whose assistant, Lydia Linebaugh, noted that Plaintiff was depressed and anxious; that her ability to follow work rules was "good," her abilities to relate to co-workers, use judgment, interact with a supervisor, function independently, and maintain attention or concentration were "fair," and that her abilities to deal with the public and work stress were "poor." (*Id.* at PageID.301). Dr. Sollars noted that she was appropriately dressed, moved "very slowly upon walking," that she was "oriented to person, place, time, and situation," that the rate and volume of her speech were "unremarkable," that there were no noted sensory difficulties, and that her eye contact and posture were "appropriate." (*Id.* at PageID.306).

### 2.    Function Report

Plaintiff filled out a function report on October 7, 2013. (ECF No. 6 at PageID.196-

203). She noted that she lived in a house with her family and that her illness affected her ability to work in that she woke up with headaches lasting for hours that were unresponsive to pain pills and exacerbated by light and noise, she had chronic back pain, and that she had sharp, shooting pain in her neck. (*Id*. at PageID.196). She took her medications daily and often could not get out of bed. (*Id*. at PageID.197). She cared for her children and had no pets. (*Id*.). She noted that headaches affected her ability to sleep "half the time." (*Id*.). Plaintiff had "no problem" dressing, bathing, shaving, or feeding herself, nor did she have trouble using the toilet or caring for her fair. (*Id*.). She needed no reminders to take care of her personal needs, grooming, or to take her medications. (*Id*. at PageID.198). She prepared her own meals about three times a week and usually made sandwiches or baked food; she did not do chores or yardwork because the sunlight bothered her head and eyes. (*Id*. at PageID.198-199). She only went outside to go to the doctor, she was able to go out alone, and she typically traveled by riding in a car; she did not drive. (*Id*. at PageID.199). She shopped in stores for food and milk but could not stand for long and could neither pay bills nor count change. (*Id*.). Her hobbies included watching her children play, which she did most of the day if she could get up. (*Id*. at PageID.200). She otherwise did not spend time with others, did not need to be reminded to go places, did not need anyone to accompany her places, and did not have any problems getting along with family, friends, or neighbors. (*Id*. at PageID.200-201). She could not bend, stand, or see well; she noted she could not stand for long and that when she bent down, she got a shooting pain upon standing back up again. (*Id*. at PageID.201). She did not finish what she started. (*Id*.). When she watched television, the light hurt her head and eyes. (*Id*.). If instructions were explained to her, she

13

could follow them well. (*Id.*). She got along with authority figures and handled changes in routine "ok," she had never been laid off from a job for problems getting along with others, and she needed no aids for mobility or getting around. (*Id.* at PageID.202). She took Lisinopril, Tylenol, and Metoprolol. (*Id.* at PageID.203).

### 3. Administrative Hearing

#### a. Plaintiff Testimony

At the administrative hearing on September 12, 2017, Plaintiff testified that she weighed about 350 pounds as of June 2017, was right-handed, and that her marital status was separated. (*Id.* at PageID.324). She had six children, ages 20, 12, 8, 6, and two 5-year old children. (*Id.*). She lived in a house with her children, had no income of her own, and never had a driver's license. (*Id.* at PageID.325). She did not drive. (*Id.*). She testified that she had gone to school until sixth grade, which she did not finish. (*Id.*). She explained that she stopped attending school at age thirteen because she and her sister had to "basically babysit" their mother to prevent her from cheating on their father. (*Id.* PageID.326). She had not worked since her employment at McDonald's in 2000. (*Id.* at PageID.327). She claimed she had an issue with the IRS reporting her income as $11,000 even though she had not worked since 2000. (*Id.* at PageID.327-328). She then testified she worked at Family Dollar for "a month or so" in 2006 as a cashier and taking stock, which she quit after the store was robbed. (*Id.* at PageID.329).

She explained that the main things keeping her from working were her migraines and back problems. (*Id.*). She switched doctors because the earlier physicians only gave her Ibuprofen and Tylenol for her back pain. (*Id.* at PageID.331). She testified that, at the

time of the hearing, she was taking three different types of blood pressure medication, diabetes medication, iron pills, and vitamin B pills. (*Id*.). She noted that she did not think the medications she took for blood pressure and diabetes helped because her blood sugar was still high. (*Id*.). She denied any side effects from her medications. (*Id*.). On a scale of one to ten, she rated her pain as an eight; she had no hospitalizations overnight since 2013. (*Id*. at PageID.332). She had gone to the hospital in June of 2017 for headaches that "just wouldn't stop," and said they gave her ice packs and Voltaren and sent her home. (*Id*.). She did not use any mobility aids or a cane, and she noted she had quit smoking. (*Id*.). She did not consume alcohol or use any illegal drugs or marijuana. (*Id*. at PageID.333).

Plaintiff testified that she had severe headaches every day lasting about two or three hours each. (*Id*.). She told the ALJ she could sit for about 20 to 30 minutes before having to lay down. (*Id*. at PageID.334). She further noted she could stand for about the same amount of time as she could sit, particularly when leaning against something. (*Id*.). She told the ALJ she could not walk for a block and that she could lift about 15 pounds. (*Id*.). She had no problems using her hands. (*Id*. at PageID.335).

She noted that she used to take Zoloft but had been off the medication for about 10 years because her insurance would not cover it. (*Id*.). She did not do chores, but did cook chicken, fries, or salad for herself at times. (*Id*.). Her oldest daughter helped with the chores and younger children; the children were able to dress themselves and get themselves on the bus to school each day. (*Id*. at PageID.335-336). Her 12-year old and 20-year old did the laundry; her 20-year old and 23-year old daughters did most of the shopping for the family. (*Id*. at PageID.336). Plaintiff did not participate in community activities like church groups

and rarely left the house because she was afraid to go outside. (*Id.*). She had a dog in her backyard, which her stepson cared for. (*Id.* at PageID.336-37). She noted she did not watch television because she found it depressing. (*Id.* at PageID.337).

Next, Plaintiff's attorney examined her. First, Plaintiff's attorney inquired about Plaintiff's past problems with giving herself insulin, to which Plaintiff replied that she did not like needles and had her daughter administer her insulin. (*Id.* at PageID.338). The last time she had checked her blood sugar, it was 436, but on other occasions it had been 428, 488, 525, and 470. (*Id.* at PageID.338-339). Plaintiff noted she had recently switched doctors. (*Id.* at PageID.339). Plaintiff testified that she was taking three types of medication for hypertension as well as blood pressure pills. (*Id.* at PageID.340).

The attorney then inquired about Plaintiff's emotional problems, during which time Plaintiff testified that she lost a daughter in 2004 and was still dealing with the pain of the loss; she would lie down crying while looking at her daughter's picture. (*Id.* at PageID.341). Plaintiff had also been molested by her cousin; she had never received any kind of treatment to deal with those issues and was eventually hospitalized for her depression, which was when she was prescribed Zoloft. (*Id.* at PageID.341-342). She had a difficult time getting medication refills, and after numerous attempts, she went off Zoloft. (*Id.* at PageID.342). Plaintiff also testified that she had difficulty getting to her last ALJ hearing because of transportation. (*Id.*).

Plaintiff additionally testified that she struggled with fear of someone breaking into the house and therefore had trouble falling asleep—sometimes falling asleep as late as 5:00 or 6:00 AM—and noted that she felt more comfortable sleeping during daylight hours. (*Id.*

16

at PageID.343). Plaintiff also used an inhaler for asthma, which she stated flared up when she got sick or walked too far. (*Id.* at PageID.344). When her asthma got particularly bad, she used a nebulizer machine, which she mainly used when she had a cold, about once a month. (*Id.* at PageID.345).

### b. Vocational Expert Testimony

The ALJ then asked the vocational expert (VE) to consider

> a person with the same age, education, and work experience as the claimant. This—this person is limited to light exertional work; they can occasionally climb ramps and stairs; and balance and stoop and crouch but they cannot crawl or kneel; they cannot climb ladders, ropes, or scaffolding or be exposed to hazardous machinery or unprotected heights. This person is limited to unskilled work which consists of simple, routine tasks involving no more than simple, short instructions and simple work-related decisions with few workplace changes; and there can be no contact with the general public; and only occasional contact with co-workers; and, and this person can have had no more than moderate exposure to [*sic*] fumes, odors, gasses, and poor ventilation . . . . So now with those limitations, would there be jobs that this person could do in the national economy?

(*Id.* at PageID.347-348). The VE responded that an individual with these limitations could do the following jobs: housekeeper or maid, of which there were 439,000 jobs in the national economy; small products assembler, of which there were approximately 193,000 jobs in the national economy; and packer or packing line worker, of which there were 311,000 jobs in the national economy. (*Id.* at PageID.348-349). The ALJ modified the hypothetical further to ask if someone who "could do jobs that are learned by demonstration only," to which the VE replied that all the listed jobs could meet that requirement. (*Id.* at PageID.349). The ALJ inquired further about what jobs an individual with all the same limitations could do at the sedentary level, to which the VE responded

that an individual with said limitations could perform the following jobs: valve inspector, of which there were about 12,000 jobs nationally; and driver and delivery service worker, of which there were approximately 159,000 nationally. (*Id.* at PageID.350). The VE clarified that it was irrelevant whether the individual did not drive at the time because they could learn to drive. (*Id.*).

>   The ALJ presented an additional hypothetical:
>
>   If this person needs some type of variation of sit, stand option, and they need to alternate between sitting and standing every 30 minutes, including now, jobs that were learned by demonstration, so would they be able to do at least maybe—two? Could they do… the other jobs that you've sited?

(*Id.* at PageID.351). The VE responded that an individual fitting the above description could perform the small products assembler job, but that the other jobs would be eliminated; however, other jobs could be substituted for the eliminated ones. (*Id.*). The VE noted that someone fitting these new limitations could perform the job of machine feeder, of which there were approximately 74,000 jobs nationally. (*Id.*).

In the final hypothetical, the ALJ asked the VE to consider an individual who "needs unscheduled breaks throughout the work day or their concentration or focus is not consistent, or either one of those or both combined will cause them to be off-task, let's say, 20 percent of the time, would there be jobs that this person could do with that limitation?" to which the VE replied that such limiting factors would render and individual incapable of working a full 8-hour work day and 40-hour work week. (*Id.*).

**F.    Governing Law**

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations[1] carve the evidence into "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513 (2016). "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a) (2016). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d) (2016). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).   Both   "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

---

[1] Various regulations were amended after the claim was filed. *See, e.g.*, *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01 (January 18, 2017) (effective March 27, 2017). The governing regulations here, however, expressly apply to claims filed before March 27, 2017, like Plaintiff's. See 20 C.F.R. § 404.1527.

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed her claim before March 27, 2017, she is entitled to the benefit of the treating-source rule.  Under that rule, certain opinions from her treating physicians can receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(c)(2). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d). Thus, the ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight

assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must also analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996).[2] Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

---

[2] Although the Commissioner has rescinded SSR 96-7p and eliminated the term "credibility" from Administration policy, SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016), the underlying regulation has remained materially unchanged, *see* 20. C.F.R. § 404.1529(c), and I agree with the courts in this District that have continued to apply SSR 96-7p to cases arising prior to its rescission.  *See, e.g., Cooper v. Comm'r of Soc. Sec.*, No. 16-cv-13477, 2017 WL 3923984, at *3 (E.D. Mich. August 21, 2017), *Rep. & Rec. adopted by* 2017 WL 3891971 (E.D. Mich. Sept. 9, 2017); *Tuttle v. Comm'r of Soc. Sec.*, No. 16-11144, 2017 WL 2928021, at *6 n. 3 (E.D. Mich. June 9, 2017), *Rep. & Rec. adopted by* 2017 WL 2905125 (E.D. Mich. July 7, 2017).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529 (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments will "not alone establish that [he or she is] disabled." 20 C.F.R. § 404.1529(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective, confirming evidence forces the ALJ to consider various factors. 20 C.F.R. § 404.1529(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994).

### G.    Analysis

Plaintiff presents two arguments, each of which I address in turn.

22

### i.        Plaintiff's argument that the ALJ erred at Step 3

Plaintiff's first argument is that the ALJ erroneously found that Plaintiff did not

"have an impairment or combination of impairments" that met or medically equaled to a

listed impairment contrary to what the first ALJ had determined. (ECF No. 15 at

PageID.404). Plaintiff contends that ALJ Perez (the first ALJ, whose decision was

overturned) was correct in noting that there was "no evidence to suggest claimant's

intellectual disability, as demonstrated by IQ scores, was not present prior to age 22." (*Id*.).

In order to satisfy the listing for intellectual disability under Listing 12.05[3] a claimant must

prove their impairment satisfies all three requirements:

> 1. Significantly subaverage general intellectual functioning evidenced by a or b:
>    a. A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or
>    b. A full scale (or comparable) IQ score of 71-75 accompanied by a verbal or performance score (or comparable part score) of 70 or below on an individually standardized test of general intelligence; and
> 2. Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:
>    a. Understand, remember, or apply information (see 12.00E1); or
>    b. Interact with others (see 12.00E2); or
>    c. Concentrate, persist, or maintain pace (see 12.00E3); or
>    d. Adapt or manage oneself (see 12.00E4); and
> 3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

---

[3] The Listing was revised, effective in January 2017, and therefore applied to ALJ Guyton's decision in March 2017. *See Revised Medical Criteria for Evaluating Mental Disorders*, 81 F.R. 66,138-01 2016 WL 5341732 (Sept. 26, 2016).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05B. Plaintiff has the burden of proving all three of these criteria, and she must do so before the Commissioner can conclude she has a listed impairment at Step 3. *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Duncan v. Sec'y of Health & Human Servs*., 801 F.2d 847, 855 (6th Cir. 1986).

Plaintiff's argument here presumes that no evidence to the contrary suffices as evidence in support of Plaintiff's contention that her intellectual disability was present prior to age 22. Plaintiff even goes a step further to contend that the lack of evidence to the contrary creates a rebuttable presumption for the ALJ to overcome with substantial evidence that Plaintiff's intellectual disability was not present prior to age 22. (ECF No. 15 at PageID.404-405). In doing this, Plaintiff impermissibly shifts the burden to the Commissioner.

Moreover, I am unpersuaded that ALJ Guyton erred in her Step 3 determination; in her decision, she explicitly quotes and applies this framework to the facts of Plaintiff's case and noted that "[w]ith regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation," that Plaintiff has "moderate limitation" adapting and managing herself, and determined that "because the claimant's mental impairments do not cause at least two 'marked' limitations or one 'extreme' limitation, the 'paragraph B' criteria are not satisfied." (ECF No. 6 at PageID.32-33).

Although Plaintiff claims the ALJ overstated Plaintiff's ability to perform daily activities and that the ability to carry out every day tasks is not mutually exclusive from being too disabled to work (ECF No. 15 at PageID.406), the ALJ's rationale regarding Plaintiff's ability to adapt and care for herself is squarely in line with what Plaintiff noted

24

in her function report: for instance, Plaintiff stated she had "no problem" with personal care. (ECF No. 6 at PageID.197). In her rationale, the ALJ cited evidence from Plaintiff's function report and hearing testimony, noting that Plaintiff was able to "prepare food, make a grocery list, and go out shopping," that she "demonstrated the cognitive ability to live independently and she reported she lived separately from her husband," could "take medications by herself," and "reported no limitations in self-care and daily hygiene." (*Id.* at PageID.35, 38). The ALJ noted further that while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms... [Plaintiff's'] statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (*Id.* at PageID.35). Further, The ALJ reasoned that with consideration of

> the factors set forth in SSR 16-3p, including [Plaintiff's] wide range of reported activities from her testimony and function reports, the lack of corroborating complaints of mental health symptoms in the medical evidence, lack of any significant treatment for mental health complaints since the alleged onset date, and the conservative methods used to treat her back pain, indicate the reported intensity, persistence, and limiting effects of [Plaintiff's] symptoms are inconsistent with the record as a whole.

(*Id.* at PageID.38).

Although Plaintiff's contention that "one does not have to be a 'vegetable' in order to have deficits in adaptive functioning" is valid, the Sixth Circuit held in *Hayes v. Commissioner of Social Security* that a plaintiff with similar abilities (cooking meals, shopping, caring for herself) indicated insufficient deficit in the plaintiff's adaptive functioning. 357 Fed.Appx. 672, 677 (6th Cir. 2009). The Eastern District of Michigan's holdings have fallen in line with the ruling in *Hayes* for plaintiffs who had similar self-care

abilities and similar physical and mental limitations. *See, e.g.*, *Crittendon v. Colvin*, No. 15-13845, 2016 WL 8261933 at *6 (E.D. Mich. Nov. 17, 2016) (noting that a plaintiff who had taken special education classes since grade three but could cook, do laundry, shop, dress himself, and take public transportation did not have a sufficient deficit in adaptive functioning under listing 12.05), *Rep. & rec. adopted by* 2017 WL 661066 (E.D. Mich. Feb. 17, 2017); *see also McQueen v. Comm'r Soc. Sec.*, No. 13-13169, 2015 WL 3966246 at *8 (E.D. Mich. June 30, 2015) (noting that a Plaintiff who could care for herself, prepare meals, shop in stores, and care for children did not demonstrate a sufficient deficit in adaptive functioning).

Additionally, on Plaintiff's own admission, the evidence to support the claim that Plaintiff's intellectual disability was present prior to age 22 is "sparse"; Plaintiff points to the testimony that at age fourteen, she left school at sixth grade to "babysit" her mother to prevent her from cheating—as well as Plaintiff's molestation by her cousin from ages eight to eleven, and her parents' drug abuse—as evidence to amount to proving this contention. (ECF No. 15 at PageID.405). While Plaintiff's childhood background is no doubt unfortunate, having a sixth-grade education itself is not proof of an intellectual disability prior to age 22; having parents who were addicted to drugs is not itself proof of a disability prior to age 22; having parents who did not trust each other is not itself a disability prior to age 22; and having been molested itself is not proof of a disability prior to age 22. *Cf. Hayes*, 357 Fed.Appx. at 677 ("[T]his Court has never held that poor academic performance, in and of itself, is sufficient to warrant a finding of onset of subaverage intellectual functioning before age twenty-two.").

26

ALJ Guyton noted that Plaintiff's subjective testimony was inconsistent with the objective medical evidence in the record and that the objective evidence did not support the purported severity and intensity of Plaintiff's limitations. (ECF No. 6 at PageID.35-36). Plaintiff also uses her IQ test scores, taken at ages 41 and 43 (ECF No. 15 at PageID.240, 296, 307), as evidence to show that she was intellectually disabled prior to age 22, but pursuant to *Foster v. Halter*, IQ testing performed in one's 40s is insufficient evidence of a Plaintiff's intellectual abilities prior to age 22. 279 F.3d 348, 354-55 (6th Cir. 2001). In *Foster*, the Sixth Circuit held that, regarding the criteria for raising a substantial question as to Listing 12.05, a plaintiff "can demonstrate that she is disabled because her impairments are equivalent to a listed impairment by presenting 'medical findings equal in severity to all the criteria for the one most similar listed impairment.'" *Id*. at 355. In that case, the plaintiff was unable to provide sufficient evidence that her limitations met the third criteria of Listing 12.05, which requires that a plaintiff prove the onset of her impairment began prior to age 22. *Id*. at 354. The plaintiff in *Foster*, like the Plaintiff in this case, provided IQ testing and medical evaluations showing Plaintiff's intellectual limitations, but they were discounted because the tests happened after Plaintiff was forty years old. *Id*. at 354-55. Moreover, the plaintiff in *Foster* also provided evidence that she left school after ninth grade; the Court found that these educational records were insufficient proof and provided no evidence that plaintiff's intellectual disability began prior to age 22. *Id*. at 355-58. The Eastern District of Michigan held the same in *Robinson v. Colvin* for a similarly situated Plaintiff who had dropped out of school and had family issues. *See* No. 13-14313, 2015 WL 12711578 at \*10 (E.D. Mich. July 14, 2015).

Further, in two recent cases, the Sixth Circuit held that "neither circumstantial evidence such as school records nor a history of special education combined with an adult IQ score are necessarily enough to demonstrate that a claimant had adaptive functioning deficits before age twenty-two." *See Eddy v. Comm'r of Soc. Sec.*, 506 Fed.Appx. 508, 510 (6th Cir. 2012); *see also Peterson v. Comm'r of Soc. Sec.*, 552 Fed.Appx. 533 (6th Cir. 2014). Thus, pursuant to this precedent, I am unpersuaded that the ALJ erred in her consideration of the sparse evidence Plaintiff produced to prove that she had an intellectual disability prior to age 22.

Plaintiff also contends that the ALJ erred at Step 3 because she did not obtain a medical source to support her finding that Plaintiff's ailments did not meet the muster for listed impairments and cites *Dorrough v. Comm'r of Soc. Sec.* in support. (ECF No. 15 at PageID.410 (*citing* No. 11-112447, 2012 WL 4513621 at *2 (E.D. Mich. 2012)). *Dorrough* was based on old regulations, however; the Social Security Administration has since rescinded the regulations for ALJs considering medical equivalence and the new regulations applicable to this case no longer require an ALJ to articulate specific evidence for his or her finding at Step 3 if they believe "the evidence already received in the record does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment." *See* SSR 17-2P (S.S.A.), 2017 WL 3928306 at *4 (effective Mar. 27, 2017). Because Plaintiff's evidence to this point was sparse, and because Plaintiff bore the burden of proving her disability and failed to do so, ALJ Guyton was under no obligation to use a medical opinion in her equivalence determination at Step 3. Under the new regulations, courts have observed that "an ALJ need not obtain evidence from a medical

expert on equivalence if the 'evidence does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment.'" *See Balknight v. Comm'r Soc. Sec.*, No. 18-11843, 2019 WL 4011881, at *26 (E.D. Mich. July 31, 2019) (quoting *Thurston v. Comm'r of Soc. Sec.*, No. 18-12744, 2019 WL 2617049, at *3 (E.D. Mich. June 10, 2019)) (collecting cases; citation omitted), *Rep. & Rec. adopted by* 2019 WL 2613180 (June 26, 2019)); ("In SSR 17-2p, the Social Security Administration clarified that an ALJ is not required to obtain a medical expert's opinion before making a finding that an individual's impairments do not equal a listing impairment...."), *Mitchell v. Comm'r of Soc. Sec.*, *Rep. & Rec. adopted by* 2019 WL 2120121 (W.D. Mich. May 15, 2019); *Jammer v. Comm'r of Soc. Sec.*, No. 18-10445, 2019 WL 1372171, at *7 (E.D. Mich. Feb. 22, 2019) ("[T]he absence of a medical opinion on the issue of equivalency does not defeat the ALJ's Step Three findings."), *Rep. & Rec. adopted by* 2019 WL 1354037 (E.D. Mich. Mar. 26, 2019). Based on these recent decisions, it appears that Plaintiff is incorrect in her argument that the ALJ was obligated to obtain a medical expert's opinion prior to concluding that Plaintiff's limitations did not amount to a listed impairment.

Plaintiff also argues that ALJ Guyton erred at Step 3 because although she found that obesity was among Plaintiff's severe impairments at Step 2, she "did not really address this issue." (ECF No. 15 at PageID.408). On this note, Plaintiff cites SSR 02-01p and contends that the ALJ did not appropriately analyze Plaintiff's obesity impairment in terms of its functional limitations on Plaintiff's ability to work. (*Id*. at PageID.408-410). The ALJ noted Plaintiff's height and weight and explained that her obesity "and body habitus were

considered and factored into the exertional and nonexertional limitations as set forth in the residual functional capacity in accordance with SSR 02-1p." (ECF No. 6 at PageID.36). Further, the ALJ opined that although Plaintiff's obesity "could reasonably cause some of her alleged secondary back pain, there is no objective evidence her obesity affects the claimant's ability to ambulate effectively, and her respirator and cardiovascular functioning are not secondarily impaired." (*Id.*). The Sixth Circuit has opined that SSR 02-01p "only states that obesity, in combination with other impairments, 'may' increase the severity of the other limitations. It is a mischaracterization to suggest that Social Security Ruling 02–01p offers any particular procedural mode of analysis for obese disability claimants." *Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 412 (6th Cir. 2006); *see also Coldiron v. Comm'r of Soc. Sec.,* 391 Fed. Appx. 435, 443 (6th Cir. 2010); *see also Essary v. Comm'r of Soc. Sec.,* 114 Fed. Appx. 662, 667 (2004).

Although Plaintiff's obesity comes up consistently in her medical records, Dr. Chwikani, whom Plaintiff visited more than Dr. Edmond, did not note limitations stemming from Plaintiff's obesity besides diabetes and hypertension; in fact, he noted no other abnormalities in her physical health. (ECF No. 6 at PageID.251, 260, 266-67). Because this objective evidence did not support additional limitations imposed by Plaintiff's obesity, I am not persuaded by Plaintiff's contention that the ALJ inadequately assessed Plaintiff's obesity in her determination.

For the reasons stated above, I am unconvinced by Plaintiff's argument that ALJ Guyton erred at Step 3 of the disability determination.

   **ii.**  **Plaintiff's argument that the ALJ erred in assessing Plaintiff's**

**RFC and ability to perform substantial gainful activity**

Plaintiff's second argument is that the ALJ's assessment of Plaintiff's RFC was unsupported by substantial evidence. (ECF No. 15 at PageID.412). In arguing this, Plaintiff points to the evaluations done by Dr. Edmond, Dr. Tripi, Dr. Boneff, and Dr. Sollars, as well as the vocational expert testimony. (*Id*. at PageID.412-416).

Plaintiff claims that the ALJ gave insufficient weight to the conclusions of Dr. Edmond that Plaintiff's limitations in standing, stooping, and being slow-moving would not allow for Plaintiff to perform "light work." (*Id*. at PageID.412-413). The ALJ noted that during her visit with Dr. Edmond, Plaintiff had been taking over the counter medication for her back pain and "was able to walk without the use of a cane and presented with sufficient grip strength. Dr. Edmond opined the claimant would have difficulty picking up a coin from the floor secondary to weight and would have limited standing with no bending, stooping, or squatting." (*Id*. at PageID.36). Looking to the record, Dr. Edmond's charts indicated that Plaintiff had limitations in her ability to stand and was unable to stoop, bend, squat, or rise from squatting; Dr. Edmond appeared to observe that Plaintiff did not need a cane to walk and had decreased range of motion in her hips and knees due to her weight, full range of motion in her cervical spine, ankles, shoulders, wrists, and hands; and intact sensory perception. (*Id*. at PageID.234-238).

ALJ Guyton's summary of Dr. Edmond's findings appears to be an accurate characterization of the findings themselves. The ALJ gave little weight to Dr. Edmond's opinion because "the limitations are unsupported by medical evidence, including the normal back exam findings, including negative back tenderness, negative extremity

31

tenderness, intact sensation, and full motor strength exhibited by [Plaintiff] during treatment." (*Id.* at PageID.36 (*citing id.* at PageID.249, 251, 252, 255)). The ALJ's RFC was nuanced, precise, and gave numerous physical and mental limitations as caveats: for instance, she noted that Plaintiff could never crawl or kneel; that Plaintiff needed short and simple instructions for work-related tasks; that Plaintiff could have no contact with the general public and only occasional contact with coworkers. (ECF No. 6 at PageID.35). In her explanation for the RFC, ALJ Guyton noted that Plaintiff both failed to provide enough objective medical evidence and that the objective medical evidence she did provide failed to strongly support Plaintiff's allegations. (*Id.*).

Further, Plaintiff contends that ALJ Guyton erred in evaluating her mental RFC because the ALJ improperly gave "little" or "partial weight" to the opinions of Dr. Tripi, Dr. Boneff, and Dr. Sollars. (ECF. No. 15 at PageID.413-416). Specifically, Plaintiff cites the limitations from these examinations, which included, *inter alia*, "marked" limitations in maintaining attention and concentration for extended periods, sustaining an ordinary routine, setting realistic goals, and accepting instructions. (*Id.* at PageID.413 (*citing* ECF No. 6 at PageID.244-45)). Additionally, Plaintiff refers to the "extreme limitations" in her ability to perform activities in a schedule, maintain regular attendance, complete a normal workday or workweek without interruptions from psychological disturbances, and her ability to tolerate normal levels of stress. (*Id.* at PageID.413-414, citing ECF No. 6 at PageID.244-246). Plaintiff also cites Dr. Sollars' contention that she had "diminished ability to think or concentrate nearly every day due to the depression and anxiety." (*Id.* at PageID.414 (*citing* ECF No. 6 at PageID.301-302)).

32

The ALJ noted that Plaintiff had been diagnosed with "intellectual disability, mood disorder, depression, and anxiety" and opined that "there is no evidence in the record indicating the claimant underwent any therapy or counseling for mental health complaints" and that "during treatment for physical complaints, the claimant presented with normal affect and behavior." (*Id*. at PageID.36 (referencing medical records on PageID.228)). The ALJ went on to discuss Dr. Tripi's psychological evaluation and noted that Plaintiff had not been treated with mental health medication, Plaintiff's IQ results, Plaintiff's mood disorder, and Dr. Tripi's opinion that Plaintiff was not capable of substantial gainful activity. (*Id*. at PageID.36). The ALJ explained that she accorded little weight to Dr. Tripi's assessment because the restrictions cited were "excessive in light of the medical record, including the claimant's presentation with normal affect and behavior during treatment for physical complaints" and because the assessment of disability was one reserved for the Commissioner. (*Id*. at PageID.36-37).

The ALJ then discussed the evidence from Dr. Boneff, who performed a consultative psychological evaluation of Plaintiff, and noted that he opined that Plaintiff would have "marked restrictions in understanding, remembering, and carrying out complex instructions and ability to make complex work decisions." (*Id*. at PageID.37; citing PageID.294-300). The ALJ gave Dr. Boneff's opinion "partial weight" because his opinion was consistent with Plaintiff's presentation with an angry and sad mood and Plaintiff's borderline IQ. (*Id*.).

The ALJ also thoroughly summarized the opinions of Dr. Sollars, who also performed a psychological evaluation and opined that Plaintiff should have no interaction

with the public, limited interaction with coworkers, and simple work. (*Id*.). The ALJ assigned "little weight" to this opinion because the findings were inconsistent with Plaintiff's "normal mental health findings during treatment, her lack of any treatment for her mental health complaints, and her wide range of adaptive functioning" and because "the ultimate decision of disability is an issue reserved for the Commissioner." (*Id*.).

A review of these objective medical findings indicates that the ALJ's assessment of the record in her reasoning was accurate and met the relevant standards. While an ALJ must evaluate every medical opinion in the record in making her determination and must provide "good reasons" for giving less weight to a treating source, the requirement for giving good reasons does not apply to examining sources such as Dr. Edmond, Dr. Boneoff, Dr. Tripi, and Dr. Sollars. *See Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 514 (6th Cir. 2010); *see also Smith v. Comm'r of Soc. Sec.,* 482 F.3d 873, 875 (6th Cir. 2007). In evaluating how much weight to give examining sources, like Dr. Edmond, Dr, Tripi, and Dr, Sollars, ALJ's decision must "say enough 'to allow the appellate court to trace the path of his reasoning.'" *Stacey v. Comm'r of Soc. Sec*., 451 Fed Appx. 517, 519 (6th Cir. 2011) (*quoting Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995)). Because these sources were *examining* sources rather than *treating* sources, ALJ Guyton was correct to give them less weight in her determination and her explanation for doing so is sufficient to meet these standards.

Additionally, the ALJ was entitled to accord little weight to the opinions of Dr. Sollars and Dr. Tripi because both sources made conclusions about Plaintiff's condition that were not only inconsistent with the objective medical evidence, but also inappropriate

34

given that neither is the Commissioner: "The determination of disability is [ultimately] the prerogative of the [Commissioner], not the treating physician." *Warner v. Comm'r Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) *quoting Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985).

Plaintiff also noted that the VE had testified that there would be no jobs suitable in the economy given the limitations suggested by Dr. Tripi. (ECF. No. 15 at PageID.413-14). While it is true that the VE said this, the ALJ gave Dr. Tripi's suggested limitations "little weight" because they were "excessive in light of the medical record," inconsistent with Plaintiff's presenting affect, and because Dr. Tripi's conclusion of Plaintiff's disability was ultimately not her conclusion to make (ECF No. 6 at PageID.36-37).

For these reasons, I am unpersuaded by Plaintiff's second argument.

### H.   Conclusion

For these reasons, I conclude that substantial evidence supports the ALJ's decision. Consequently, I recommend **DENYING** Plaintiff's Motion, (ECF No. 15), **GRANTING** the Commissioner's Motion, (ECF No. 19), and **AFFIRMING** the Commissioner's final decision denying benefits.

### III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections

constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  January 14, 2020                                      S/ PATRICIA T. MORRIS
                                                             Patricia T. Morris
                                                             United States Magistrate Judge

<u>**CERTIFICATION**</u>

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: January 14, 2020                     By <u>s/Kristen Castaneda</u>
                                            Case Manager